IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

JOSEPH L. MILLER,                        )
                                         )
           Plaintiff,                    )
                                         )
v.                                       )     Case No. CIV-12-119-KEW
                                         )
SULPHUR MANOR, INC., f/k/a               )
Callaway Nursing Home, Inc.,             )
d/b/a Legacy Living Centers,             )
                                         )
           Defendant.                    )

## OPINION AND ORDER

This matter comes before the Court on Defendant's Motion for
Summary Judgment (Docket Entry #86).  Briefing is completed and the
matter is ripe for consideration.

### Factual Findings

On June 23, 2009, Plaintiff Joseph Miller ("Miller") was hired
by Defendant Sulphur Manor, Inc. ("Sulphur") as a full-time
Maintenance Supervisor.  He began work the next day.  Miller was
considered an at-will employee and understood that he could be
terminated for any reason.

Upon being employed by Sulphur, Miller acknowledged receipt of
the employee handbook, sexual harassment policy, cell phone policy,
employee code of conduct, and general orientation policy.
Additionally, Miller signed a Notice of Criminal Arrest Check.
Miller was aware that his employment with Sulphur was temporary
until the criminal arrest check could be completed.

On June 23, 2009, the Industrial Foundation of America on
behalf of Sulphur submitted a request to the Oklahoma State Bureau

of Investigation ("OSBI") to conduct a criminal history background check on Miller. On June 26, 2009, the request was returned with a stamp affixed to it which read "BASED UPON THE INFORMATION PROVIDED, THE SUBJECT MAY BE THE SAME AS OSBI #1434604. A COPY OF THE RECORD IS ATTACHED."

The record attached to the request indicated Miller entered a guilty plea for assault and battery on November 10, 2005 in Murray County, Oklahoma. He received a deferred sentence of one year. About a year into Miller's employment at Sulphur, he became aware that if an employee is charged with assault and battery, he is not allowed to work in a nursing facility. Miller was concerned he might be fired due to this plea and deferred sentence. He acknowledged that when Sulphur received the report and knew he was convicted, they should have "fired him on the spot."

Miller's immediate supervisor at Sulphur was Debra Alexander, Sulphur's Head Administrator. While Miller was referred to as a Maintenance Supervisor, he was the only employee in the maintenance department. On June 24, 2010, Miller received a Employee Job Performance Evaluation from Debra Alexander. He received a score of 78 out of possible 90 which, according to the Evaluation, placed Miller in the "above average" range. In the "Supervisor's Additional Comments" section, Ms. Alexander stated Miller "needs to be more aware of his tone when communicating with his fellow employees.

On December 2, 2010, Debra Alexander testified in her

2

deposition that Miller was fired for violating Sulphur's excessive breaks company policy and insubordination. Miller had an altercation with Jackie Alexander, Sulphur's Director of Nursing and Debra Alexander's spouse, wherein a heated exchange occurred and curse words were traded. Jackie Alexander allegedly accused Miller of "sneaking" with other employees to take smoke breaks and for lying about Jackie Alexander on Facebook. Miller testified Jackie Alexander concluded the exchange by stating "you're fucking fired" and clocked Miller out. Miller states that he went to his truck and called Debra Alexander, explaining what had occurred with Jackie Alexander. She allegedly stated Jackie Alexander did not have the authority to fire Miller and that she would straighten matters out the next day.

At a meeting between the three, the excessive smoke breaks were discussed and Jackie Alexander wanted an apology from Miller for cussing at him. Miller apologized and Debra Alexander told him to go back to work. Although Miller was allegedly terminated from his employment with Sulphur, no termination paperwork appears in the record on summary judgment.

At all times relevant to this case, Miller's cell phone carrier was U.S. Cellular. During this period, Miller frequently communicated by text message, multimedia messages, and telephone calls with various employees with Sulphur, including Carrie Billings ("Billings"), a Licensed Practical Nurse at the facility, Mackenzie Digby ("Digby"), a Certified Nurse's Aide, Melanie Kirby

3

("Kirby"), the Assistant Director of Nursing, Judy Atchley ("Atchley"), designated as the "ACT/SOC SERVICE" in the nursing home directory, and Cindy Villines ("Villines"), the Housekeeping Supervisor.  Many of these messages were admitted by Miller to be of a racist or sexual nature.

With regard to Atchley, Miller sent three text messages and called her on two occasions.  He admits to sending Atchley racist jokes in the form of pictures.  With regard to Villines, she provided a statement which indicated Miller sent her a picture text of naked female body parts.  She also stated Miller would talk about all the dirty pictures on his phone.  Villines asked him to stop and he complied.  Miller testified he never sent her any text messages of female body parts but did send her an African American joke which showed a picture of a playpen and stated "how do you train," admitting it was a racist joke.  He sent this to Villines because her daughter "is into black people and she's white."  Villines asked Miller to stop sending the messages and he doesn't know of sending any other messages.

Miller sent Digby several messages of a sexual and racist nature.  One included a picture of a black man who "looked like he stuck his finger in a light socket and underneath the picture it said, 'Look at this buck I shot, I brought him in with KFC scent and blunt smell.'"  Miller recalled one sexual message with a picture of a topless woman and the comment, "My those look heavy."  Miller also sent other pictures of topless women.  He did not

believe he sent any pictures of men or pornographic videos of people engaging in sex to Digby.

Although Miller states that he never sent any text messages to Kirby, the cell phone records associated with him show he sent 14 text messages to Kirby during his employment with Sulphur. Miller also identified several other employees to whom he sent racist jokes and sexual and pornographic material.

Between December 9, 2010 and March 22, 2011, Miller sent some 202 text messages to Billings with 191 being sent between March 17, 2011 and March 22, 2011. Miller testified Billings initiated some of these messages. Miller has not produced any evidence in the record on summary judgment any messages from Billings. Without relating the detailed content of these messages, many contained videos or pictures depicting sexual intercourse or masturbation. Miller considered the text messages to be humorous and not offensive. Any messages Miller received from Billings were not shown to Debra Alexander, Miller's immediate supervisor.

On March 19, 2011, Miller contends Billings sent him a proposal for sex and he replied that he would only meet her and have sex with her if his girlfriend, Marcie Casaga, was "up for a threesome." On the same day which was a Saturday, Miller made three telephone calls from his cell phone lasting three minutes or less to the Oklahoma State Department of Health to report that Billings was abusing and neglecting his grandmother, who was a resident of Sulphur. Miller did not speak to anyone at the

5

Oklahoma State Department of Health but he left messages to return his calls.  Miller contends he learned of the abuse from his girlfriend who was also an employee at Sulphur.

On March 21, 2011, Miller made five telephone calls on his cell phone to the Oklahoma Board of Nursing, each lasting three minutes or less.  Miller did not call the Oklahoma State Department of Health on that day.  Miller did not inform Debra Alexander of the alleged abuse or neglect of his grandmother.  He did inform at least one unidentified CNA at Sulphur that he had contacted the state agencies to get people in trouble.

On March 22, 2011, Debra Alexander heard Miller talking loudly at the nurse's station and threaten to turn employees into the Oklahoma Board of Nursing.  Debra Alexander called Miller into her office to discuss the matter.  The meeting was attended by Debra Alexander, Miller, and Kirby.  Debra Alexander asked if Miller was having problems and he told her he didn't like the way things were going and he was going to turn people in and get their license taken away from them.  When he was asked why, Miller told Debra Alexander that his grandmother was not being cared for.  Debra Alexander told him that if he had a problem with anyone's care that he should have brought it to her so something could be done about it.

Debra Alexander obtained Miller's grandmother's file from the nurse's station and went over it with Miller.  Miller stated his grandmother had a urinary tract infection.  Debra Alexander

6

testified Miller's grandmother's chart indicated a urine specimen had been obtained and sent off and the physician had ordered that she be given medicine.   Ten days later, another specimen was obtained which indicted she was clear but then developed another infection.   She later went to the hospital.

Miller did not personally observe that his grandmother was being abused or neglected.   His knowledge came solely from his girlfriend.

Miller's girlfriend reported that Miller's grandmother was "not herself" and that Billings and Stacy Beasley ("Beasley"), another LPN at Sulphur, the nurses on duty, "both acted like they didn't care."   She believed that the nurses were not taking the precautions to make sure Miller's grandmother was okay.   As a result, Miller reported Billings and Beasley to the Oklahoma State Department of Health and Oklahoma Nursing Board.

On March 19, 2011, the same day Miller first contacted the state agencies, Marcie Casaga, Miller's girlfriend from whom he received the information regarding his grandmother's alleged abuse and neglect, was disciplined by Billings for practicing outside of the scope of her duties by calling a physician regarding the status of Miller's grandmother without the charge nurse's permission.   On March 20, 2011, Casaga was disciplined again and recommended for termination.   These disciplinary acts occurred prior to Miller reporting Billings and Beasley to the state agencies.

On March 23, 2011, Billings, Beasley, and Kirby were called

7

into Jackie Alexander's office to have a meeting with Jackie and Debra Alexander.  Jackie Alexander told Billings to watch her text messages and conversations with Miller.  All were notified by Jackie Alexander that Miller was turning the nursing home in to the state agencies because he didn't feel like they got his grandmother in to see a doctor or to the hospital soon enough.

When Jackie Alexander told Billings to watch her text messages with Miller, Billings approached him with some of the text messages that she had received from Miller.  Billings told Jackie Alexander that over the weekend of March 20, 2011 she had received one picture which Miller told Billings was a picture of his exposed penis and two other pictures that were of his "private area."  When Billings received these pictures, she told Miller not to be doing that.  She was offended by the depictions.  She showed the pictures to Beasley.  Beasley attests that she observed two text messages on Billings' cell phone from Miller.  One stated "would you have an affair on your husband with me."  The other was a text message stating Miller wanted to receive oral sex from Kirby and have sexual intercourse with Billings, Digby, and another unidentified employee.  Beasley states that she observed that Miller texted pictures to Billings but she did not open them.  Billings told her at the time that the picture was of Miller's penis.  Beasley states that she reported the text messages to Jackie Alexander, her supervisor, and prepared a written statement.

When Jackie Alexander was told of these pictures, he insisted

8

that Billings report the matter to the Sulphur Police Department because it was against Sulphur's "company policy for sexual behavior or harassment . . . ." Billings states that she was not complaining about the text messages or requesting that the police be notified.

Debra Alexander was not working on March 23, 2011 but was called by Jackie Alexander. He told her that Billings had come to his office and that she was very upset because Miller had sent her a picture of his penis on her cell phone. Debra Alexander then spoke with Billings on the telephone and Billings "told [her] the same thing." Debra Alexander asked Billings if she had sent Miller photos of herself and Billings told her she did not. Debra Alexander spoke with Jackie Alexander again and told him to terminate Miller, get his keys and call the police to get a police report and start getting statements.

Some time later after Miller had been terminated, Debra Alexander stated that she saw pornographic videos on Billings' cell phone. Debra Alexander had this conversation with Billings to verify that Billings had not engaged in "the same offense that [Miller] had." Billings admitted having sent Miller text messages containing jokes, cartoons of a sexual nature but denied ever sending Miller nude pictures of herself. Ultimately, no one at Sulphur but Billings observed the texted picture of Miller's penis and the alleged message indicating it was his penis. Billings deleted the picture from her cell phone thereafter because "she got

freaked out" and "was afraid her husband was going to see it . . .
. "

Debra Alexander stated that there had been a prior case at
Sulphur where an employee was taking pictures of his penis in a
resident's room at the nursing home facility.  That employee was
ultimately arrested and prosecuted.

When the Sulphur Police Department was called, an incident
report was completed.  Billings wrote out a statement that said she
had received

> several photos of Joe Miller's penis thru txt messaging
> on my phone.  One photo showed his penis out of his
> shorts saying 'Peek a boo.'  The other ones was him
> standing up exposing all of his penis some captions
> stated 'why don't you take and break & cum visit me.'  He
> also text me saying he has jacked off some (sic) many
> times thinking about me that he has made his penis sore.
> He has said in txt messaging that there are a few people
> up there he would like to fuck & he specifically named
> Madkenzie, Stacy, Jessica, and myself.  And then stated
> he would like to get a blow job from Melanie, our ADON
> (assistant director of nursing).  Joe Miller cell phone
> # _____.

Paul Luna, an officer with the Sulphur Police Department, took
statements from Billings, Beasley, and Miller.  Beasley told
Officer Luna of her conversations with Billings regarding the
messages received from Miller.  Miller told Officer Luna that
Billings had texted him and asked of details in his sex life
because her husband would not have sex with her and she needed the
details of others' sex lives.  Since that time, Miller told Officer
Luna that Billings and Miller had been texting pictures of nude
people to one another.  According to the official incident report,
Miller also told Officer Luna that he took pictures of his own

penis and sent them to Billings via his phone. Miller also stated that he had contacted the state nursing board on the nurses at Sulphur and Billings was mad at him. Officer Luna stated in his report that he observed nude photos of other women forwarded by Billings to Miller. Miller now denies he ever sent pictures of himself to Billings and states that Officer Luna was less than truthful in his report that Miller told him he had sent such pictures. Officer Luna prepared an Affidavit for Arrest and Detention charging Miller with the public offense of Obscene Material in violation of Title 21 OS 1021.3 and E. No criminal charges were filed against Miller as a result of this incident.

On March 23, 2011, Miller was terminated from his employment at Sulphur. He was informed by Debra Alexander that he was being terminated for sexually harassing Billings.

Some time after Miller's termination, Debra Alexander completed a disciplinary action form on Billings for her part in exchanging sexually explicit text messages with others. The form went into Billings' personnel file.

After Miller was terminated, three other employees have held the position of maintenance supervisor at Sulphur with the same job description and duties. All were male.

Miller initiated this case on March 15, 2012 alleging his termination was as a result of (1) reverse gender discrimination in violation of Title VII; (2) retaliation in violation of Title VII; (3) wrongful discharge as against public policy in violation of

11

state law under the Oklahoma Protective Services for Vulnerable Adults Act and/or Oklahoma Nursing Home Care Act as permitted under Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989); and (4) a direct violation of the Oklahoma Protective Services for Vulnerable Adults Act.

### Standard on Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that, there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party bears the initial burden of showing that there is an absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986).  In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that

12

there is a genuine issue for trial.  Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

After reviewing the respective statements of the facts which the parties have proffered with their pleadings, this Court concludes that no dispute exists as to the facts which are material to the issues raised by the Motion.  Consequently, the sole issue remaining for determination in this Order is whether Sulphur is entitled to judgment as a matter of law as urged in the Motion.

## Title VII - Reverse Gender Discrimination

Title VII specifically prohibits discrimination in employment on the basis of an individual's sex.  42 U.S.C. § 2000e(2)(a).  A plaintiff may prove intentional discrimination "either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).  The test for a Title VII claim is different when direct evidence of sex discrimination is presented.  "[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination."  Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1984).  Direct evidence requires the plaintiff to show that the employer actually relied upon his or her gender in making an employment decision.  Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) superceded in other respects by 1991 amendments to the Civil Rights Act.  The Tenth Circuit discussed at length the

13

distinction between direct and indirect evidence in the case of
Ramsey v. City and County of Denver, 907 F.2d 1004 (10th Cir. 1990)
*cert. denied* 506 U.S. 907 (1992). In that case, the Court stated
"[i]n 'direct' evidence, witnesses testify directly of their own
knowledge of the main fact or facts to be proved, while
'circumstantial' evidence is the proof of certain facts and
circumstances in a given case from which a jury may, under certain
conditions, infer other connecting facts which usually and
reasonably follow according to the common experiences of mankind."
Id. at 1008 citing Wilkins v. Hogan, 425 F.2d 1022, 1025 n. 1 (10th
Cir.1970). Miller does not argue that he has direct evidence of
gender discrimination but rather indirect evidence. As a result,
this Court will examine the evidence under the required burden
shifting analysis of the McDonnell Douglas case.

A traditional *prima facie* case of gender discrimination
requires sufficient circumstantial evidence to show: "(1) [Miller]
is a member of a protected class, (2) [Miller] suffered an adverse
employment action, (3) [Miller] was qualified for [his job], and
(4) [Miller] was treated less favorably than others not in the
protected class." Turner v. Pub. Serv. Co. of Colo., 563 F.3d
1136, 1142 (10th Cir. 2009). As a member of an historically
favored group, however, Miller may not rely on the traditional
factors to establish a *prima facie* case by way of circumstantial
evidence, unless, "in lieu of showing that he belongs to a
protected group, [he] establish[es] background circumstances that

14

support an inference that the defendant is one of those unusual employers who discriminates against the majority." Notari v. Denver Water Dept., 971 F.2d 585, 589 (10th Cir. 1992).

As Miller indicates, the Tenth Circuit adopted the Fourth Circuit's alternative test for a *prima facie* case in stating "a plaintiff who presents direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff states a prima facie case of intentional discrimination under Title VII." Id. at 590. However, the Tenth Circuit also made clear that the showing remained different plaintiff's asserting reverse gender discrimination by continuing

> We emphasize that a plaintiff who attempts to state a prima facie case in this fashion is not entitled to rely on the presumption that is implicit in the *McDonnell Douglas* prima facie case analysis. In other words, it is not enough, under this alternative formulation, for a plaintiff merely to allege that he was qualified and that someone with different characteristics was the beneficiary of the challenged employment decision. Instead, the plaintiff must allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred.

> Id. at 590-91.

Miller has failed in his required showing in this regard. Debra Alexander and, by extension, Sulphur terminated Miller because they believed both from direct statements from Billings and from the police report that was presented to them by Officer Luna

that he had transmitted sexually explicit images of himself to Billings - an action considered more egregious than the texting of pornographic images of others and considered criminal in nature. While Miller now denies he sent such pictures, those were not the facts presented to Debra Alexander at the time the decision to terminate was made.   Nothing in the manner in which Miller was treated even remotely indicates that Debra Alexander or Sulphur was motivated by Miller's gender.  No reasonable inference can be drawn from the evidence presented that but for Miller being a male, he would not have been terminated.  Miller has failed in satisfying the first element of his *prima facie* case of reverse gender discrimination.

Additionally, Miller was not qualified to hold the position at Sulphur.  Miller argues the term "qualified" is synonymous with the term "satisfactory."  No Tenth Circuit case authority takes this position.  Indeed, the term is more often used in the context of a failure to hire or promote case.  But under those circumstances, the Tenth Circuit has stated "'[e]mployers are given wide discretion in setting job standards and requirements and in deciding whether applicants meet those standards.'  Hickman v. Flood & Peterson Ins., Inc., 766 F.2d 422, 425 (10th Cir. 1985). As long as the qualifications offered by the employer are reasonable and have been consistently applied to all applicants for the position, as was the case here, there is no reason for the fact

finder to supplant the employer's list of qualifications with its own." York v. American Tel. & Tel. Co., 95 F.3d 948, 954 (10th Cir. 1996). In this case, the qualifications for the job held by Miller are, in part, established by state law. If a nursing facility such as Sulphur seeks to offer employment to "a nurse aide or other person to provide nursing care, health-related services or supportive assistance to any individual" in the facility, the employer is required to provide for a criminal history background check. Okla. Stat. tit. 63 § 1-1950.1(B). The person is not to be hired or, if temporary employment is offered pending the background check, the person shall be terminated if he has "been convicted of, pled guilty or no contest to, or received a deferred sentence for . . ." "assault, battery, or assault and battery with a dangerous weapon." Okla. Stat. tit. 63 § 1-1950.1(C)(1) and (F)(1) & (2).

In this case, Miller received a deferred sentence for assault and battery. He arguably is one offering "supportive assistance" as a maintenance supervisor in the facility. He was informed at his hiring that he was being temporarily employed pending the outcome of a criminal background check. Miller was aware that Sulphur required a background check and acknowledged the fact. He agreed he should have been immediately terminated upon Sulphur's receipt of the background check. Sulphur's failure to terminate him at that time, however, does not change the fact that he was not qualified to hold the position as a matter of state law

Consequently, the second required element of McDonnell Douglas is not present.

A significant question exists as to whether Miller has demonstrated that he was treated less favorably than similarly situated individuals that are outside of his class. As has already been stated, "[i]t is not enough . . . for a plaintiff merely to allege that he was a qualified man who was treated differently than a similarly situated woman. . . . Instead, he must allege and produce evidence sufficient to support a reasonable inference that, but for his status as a man, the challenged decision would not have occurred. . . ." Adamson v. Multi Community Diversified Services, Inc., 514 F.3d 1136, 1150 (10th Cir. 2008)(citations omitted). Again, Miller has failed to show that his status as a man determined the adverse employment action taken against him.

Moreover, Miller and the nurses were not similarly situated. The Tenth Circuit has defined the similarity requirement as follows:

> To show disparate treatment, [a plaintiff] must establish she was similarly situated to [the person outside of the plaintiff's class] in all relevant respects. Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." Id. In determining whether two employees are similarly situated, a "court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." Id. Moreover, even employees who are similarly situated must have been disciplined for conduct of "comparable seriousness" in

18

order for their disparate treatment to be relevant.
<u>Kendrick v. Penske Transp. Servs.</u>, 220 F.3d 1220, 1230
(10th Cir. 2000).

<u>McGowan v. City of Eufala</u>, 472 F.3d 736, 745 (10th Cir.
2006).

Billings was a licensed nurse who reported to Jackie
Alexander, the Director of Nursing. Miller was a maintenance
supervisor who reported to Debra Alexander. Billings'
responsibilities and duties differed greatly from those assigned to
Miller. Miller was a maintenance supervisor while Billings was not
a supervisor. Additionally, Billings' and the other nurses'
conduct was not of comparable seriousness with that for which
Miller was accused by Billings and as reported by Officer Luna
after his investigation. While Miller attempts to make much of the
fact that Billings now states that she was not complaining of
Miller's conduct, this does not change the nature of the
seriousness of the conduct nor the fact that it amounted to sexual
harassment. Having failed to satisfy all of the elements of the
test, Miller's reverse gender discrimination claim fails.

### Title VII - Retaliation

Miller also contends Sulphur retaliated against him for
reporting Billings sent him sexually oriented text messages. In
order to prevail on his claim for retaliation in reporting this
conduct under Title VII, Miller must prove in his *prima facie* case
that: (1) he engaged in protected opposition to the Title VII
discrimination or participated in a Title VII proceeding; (2) he

suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a causal connection between the protected activity and the adverse employment action. Chavez v. City of Arvada, 88 F.3d 861, 865-66 (10th Cir. 1996) citing Burrus v. United Telephone Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir.) *cert. denied* 459 U.S. 1071 (1982).

Miller's testimony does not demonstrate that he was protesting sexual harassment or engaging in any protected activity at the time he mentioned Billings' texts. He was complaining about the care he believed his grandmother was receiving at Sulphur, generally, and Billings' care, specifically. It was only in this context that he mentioned Billings' text messages. More importantly, Miller has failed to draw any causal connection between reporting the messages and his termination. Indeed, according to Debra Alexander, the decision had already been made to terminate Miller when he mentioned Billings' texts. The connection is simply too remote to satisfy the third element required to prove a claim for retaliation.

### Remaining State Law Claims

The remainder of the claims asserted against Sulphur are based in state law. This Court need not reach these claims since the sole basis for federal jurisdiction lies in the federal question represented in Miller's federal Title VII claims. Supplemental

jurisdiction over the <u>Burk</u> claim and claim based in the OPSVAA against Sulphur is declined, this Court having dismissed all claims over which it possesses original jurisdiction.   28 U.S.C. § 1367(c)(3).   The remaining state law claims will be dismissed without prejudice to refiling in state court.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Docket Entry #86) is hereby **GRANTED** in relation to the federal claims for reverse gender discrimination and retaliation based in Title VII.   This Court declines to exercise supplemental jurisdiction over the remaining state law claims.

IT IS FURTHER ORDERED that the converted motion for summary judgment exclusively addressing the viability of Plaintiff's state law claims (Docket Entry #21) is deemed **MOOT** based upon the declination to exercise supplemental jurisdiction.

IT IS SO ORDERED this _29th_ day of March, 2013.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE